Good morning, Your Honors. I'm Jonathan Levy with the United States Department of Justice, representing the federal defendants in this case. I'd like to reserve five minutes for rebuttal. We do, sir. Just watch the clock. Thank you, Your Honor. The statutory language that is at issue in this case is admittedly unclear, but the legislative history and congressional intent here is actually very clear and very straightforward. Boy, are you giving up on the Chevron argument in the first minute of your presentation? No, Your Honor. In our view, the Chevron step one analysis is not based solely on the statutory language. Indeed, in Chevron itself, the Supreme Court relied on legislative history and other sort of standard tools of statutory construction. The step one analysis is really determining congressional intent. And if that can be determined by the legislative history and other sort of standard tools of statutory construction, the step one analysis is really determining congressional intent. Now, is it clear in step one the language is ambiguous or not? With respect, Your Honor, no. The question in Chevron step one is whether congressional intent is clear. And although the statutory language is obviously the first stop and the most important one at determining congressional intent, whereas here statutory language on its face is unclear, there is necessary recourse to the other normal tools of statutory construction. And here the structure of the statute itself is really what is telling, because in enacting the IKEA, Congress really did two important and very closely related and complementary things. The first thing that it did, which is really not disputed in this case, is that it made Indian Health Service facilities eligible to receive Medicaid funds. What that meant, essentially, was that Indian Health Service facility services that were provided to indigent or, to be more precise, Medicaid-eligible Native Americans were being shifted by this statute from the Indian Health Service budget to the Medicaid budget. That was the first and most important innovation of the IKEA. Now, if that had been all that the statute did, it would have shifted significant costs from the Federal Government to the States, because the Federal Government provides 100 percent of the funding of Indian Health Service facilities, and the States and Federal Government share Medicaid costs. So if all that Congress had done was shift those costs from the IHS budget to the Medicaid budget, it would have shifted significant expenses to the States. And the record is very clear that Congress did not want to shift new costs to the States by doing this. And that's why it enacted the portion of the statute that is at issue here today, the special 100 percent reimbursement rate. And it said the purpose of this 100 percent reimbursement rate is to ensure that the first part of the statute, the shift from the Indian Health Service's budget to the Medicaid budget, does not result in new costs to the States. So for the services that are being newly being made eligible for Medicaid funding, those services will be also eligible for a special 100 percent Medicaid reimbursement rate. So that no new costs are imposed on the States. Those two portions of the statute fit exactly together. Now, the only remaining question, then, for this Court to answer is, prior to the enactment of the IKEA, who was paying for Medicaid services that were not performed by the Indian Health Service, but were performed by private providers to whom a patient had been referred? And the answer to that question is also very straightforward and relatively simple, because as this Court acknowledged in McNab, and as our opponents also acknowledge, the Indian Health Service has always applied the payer of last resort rule to any referrals. And what that means is that all of the services at issue in this case are Medicaid-eligible services. Any service that is a Medicaid-eligible service is automatically not paid for by the Indian Health Service under its referral program, because the Indian Health Service's referral program, again, as this Court pointed out in McNab, is the payer of last resort and is specifically the payer of last resort with respect to Medicaid. So as long as an individual receiving a service is eligible for Medicaid, it is the Medicaid program that has that responsibility to pay for those services. That was true before IKEA was enacted. That is still true today. The IKEA statute did not really affect those referred services in any respect. I like your clear presentation of the legislative history, but when I looked at it, I didn't see anything quite so clear. Is there anything in the legislative history you can point to that would say it was Congress's intent not to lessen the burden on the states? I understand that they didn't want to raise the burden of payment on the state, but I didn't see anything suggesting that they wanted it to be exactly even and they were just canceling out the additional burden that would happen by the shift, the Medicaid shift. Well, I think you are correct, Your Honor, that there is no specific statement that Congress did not, that in addition to not wanting to impose any new burden, there is no specific statement that says, and by the way, we also don't want to lessen the State's burden. I think we have to take what Congress said at face value. It would be very odd if Congress, in fact, intended to lessen the burden, for it, instead of saying that, to say all we want to do, well, to say that what we are doing is being sure that we don't impose any new burden. It's sort of a pregnant negative, if you will. The fact that what Congress actually said is, we are enacting this 100 percent rate in order to avoid imposing new costs indicates that that is the purpose. If Congress wanted to enact this special 100 percent rate in order to actually lessen the State's burden, one would have expected it to say so, and it didn't do that. There's nothing. And then for the first year of the statute, the State was reimbursed 100 percent. No, that's incorrect, Your Honor. For the first approximately 20 years of this statute's existence, no State even attempted to claim the 100 percent reimbursement rate for these services. At the beginning of this, what has led to this case in, I believe, 1999, so the IKEA was enacted in 1976, no State for decades even attempted to recover 100 percent for these types of services. But in 1999, I believe, is when this started, at least for Arizona. And it went through the normal administrative process so that the first line payer who dealt with Arizona did make payments based upon Arizona's representation that these services were eligible for the 100 percent rate. But that went through the normal administrative procedures, and what was that decision, if you will, that payment was ultimately reversed by the Secretary's proxy, which is the Departmental Appeals Board here. So is there any circumstance which has changed since 1976? Is there any circumstance? Well, not that is directly relevant to this case, Your Honor. That change, though, that Arizona's change in billing was based on a memo, an interpretation that was prepared by a regional office, and then that was ultimately rejected by the DAB. Is there any history of policy interpretations that are consistent with what you're now saying is the correct interpretation of the statute? Yes, there is. And without going into too much detail, there's a tremendous amount of detail of that history in the decision of the Department of Appeals Board, which is in the excerpts of record. This interpretation of the Secretary has been consistent. The first interpretation was issued, I believe, within a year of the enactment of the IKEA, and the Departmental Appeals Board decision goes through a series of communications specifically with Arizona. There are also communications with others that are consistent in presenting the Secretary's interpretation that in order to qualify for this special 100 percent reimbursement rate, the Indian Health Service facility has to be responsible for the provision of the services. And, in fact, an important part of the DAB's decision points out the fact that it really would have been grossly unfair for Arizona to claim to have relied on this single memorandum when it's surrounded by other memoranda that make clear the Secretary's decision. And, frankly, to be fair, even that 1997 memorandum on which Arizona places so much weight, it does not say anything that is inconsistent with the Secretary's opinion here, and it would be absurd to think that the Secretary would announce a change of its 20-year-long consistent policy in an issue that has nationwide application and involves hundreds of millions of dollars annually in a memo by a regional director that's to one State, to one region that doesn't even address the entire nation and addresses a question that was presented about a very narrow issue of emergency transportation. It just doesn't make sense. I'm sorry, Yara. This interpretation is based on, that was related in the DAB opinion, on what to me was a little bit confusing about a difference between independent contractors, as I said, and service providers, and it certainly is not a clear-cut sort of distinction. Maybe you could explain that a little better. I will try. I think part of the problem is that the contract care services is not the most well-named program. But what the contract services provides is really a referral program coupled with a payer-of-last-resort provision. So what it means is that the IHS essentially has a list of providers that have agreed to a certain rate cap on their services. And the IHS will make referrals to these providers and at the same time will agree to be the payer-of-last-resort with respect to those services. Now, with respect to the services that are at issue in this case, the payer-of-last-resort provision never comes into play. The IHS never pays for these services. And the reason is that we're talking about Medicaid and we're talking about Medicaid eligible individuals. It is clear from McNab that the hierarchy is that Medicaid pays first. So none of the services that are actually provided in this case are, in fact, contract health services, because contract health services are only when the IHS functions as the payer-of-last-resort. And I admit that this causes some confusion. So they refer, so the IHS refers a member, one of their Indian patients, to this independent provider and only if that person is not Medicaid eligible would IHS come in to the picture, is that correct? That's correct, not Medicaid eligible or eligible for any other. Or otherwise. Yes. Then can you give some examples of what the independent contractor type situation, the converse is? Sure. That's a dramatically different situation. There might be an Indian health service facility that has, say, ten physicians who work there. And if you were a patient, those ten physicians would essentially be identical to you in their functioning. But it might be that for fiscal reasons or because some of them only work part-time or for other types of reasons, that some of those physicians are employees of the Indian health service. And some of those physicians are independent contractors hired by the Indian health service. They would function in essentially an identical way, but they would be paid or hired in a different way. Some of them would be employees. Some of them would be contractors. But their work would be treated the same, certainly for purposes of Medicaid reimbursement and for other purposes, in the sense that no matter whether your service was performed by an Indian health service employee or by an independent contractor in this sense, the Indian health service would be responsible for providing the services. If it were covered by Medicaid, the Indian health service would bill Medicaid, and it would be subject to the 100 percent reimbursement. Would these be services received by the Indian health service? Would these be services received through an IHS facility? They would, yes. And why is the language services provided in service facilities used in 1396J? Well, the reason that there's a difference there is that there's a very narrow class of categories of services that are, in fact, Indian health service facility services  of an Indian health service hospital. There might be an outpatient clinic, for example, that Indian health service employees or independent contractors, but Indian health service doctors go to a different side and provide services for which the Indian health service is responsible. Those are services provided through an Indian health service facility. They're not services provided in. But are they treated differently in terms of reimbursement? No. They are treated the same in terms of reimbursement because they are services provided through an Indian health service facility. By contrast, the services we're talking about here are performed by providers who have almost no relationship, certainly no independent contractor, no employee relationship with the Indian health service. They're private contractors. And the only reason the Indian health service is even in the picture is that the patient, you know, walked into an Indian health service facility.  The Indian health service provider will or won't perform that service. But if you go down the block, there's a private provider who can do it and will be payer of last resort, but that doesn't really apply to you because you have Medicaid. And that's the only connection? I thought there was a little more connection, in fact, than that. That's, well, the Indian also has to be eligible, according to Arizona, to receive Indian health service facilities. Isn't there a contract, though, between IHS and that independent provider? For reduced rates or for it to be in network or whatever you call it? Yes. That's correct, Your Honor. There is an agreement to charge only certain rates. But, again, that's a vast difference between, say, an independent contractor whose work is the work of the Indian health service. The Indian health service is responsible for it in every sense of the word, as opposed to, you know, what might occur in the legal profession, too. I might refer a client to a colleague and simply have an arrangement that the colleague will charge a certain hourly rate. Counsel, what is the government's position with respect to the Eighth Circuit case, North Dakota v. Centers for Medicare? Well, we respectfully request that you not go into conflict with that decision, which held at Chevron step one phase that the issue that you raised first in this argument, Your Honor, it said that the legislative language was unclear, but it still held that the legislative intent was unclear. I found that case to be very dubious, frankly, in terms of a proper Chevron analysis. Well, with respect, we agree with the Chevron analysis in the sense that these other ways of determining congressional intent can and should be looked at at step one of the Chevron analysis, and that the legislative intent is clear at step one using those usual tools, that what Congress wanted to do was enact a 100 percent reimbursement rate. The government's position is the language is unambiguous. No. Sorry, strike that. Is which? Is ambiguous. The language, the phrase received through an Indian health service facility by itself is ambiguous. Is ambiguous. Yes, Your Honor. Is ambiguous. That phrase by itself is ambiguous. Congressional intent is not ambiguous. Is clear. Is clear. Of course, you know, I can't leave the podium without saying that to the extent this to land, it is obvious, should be obvious, that the Secretary's interpretation is a reasonable one that, you know, applies what Congress intended to do here. I'd like to reserve the remainder of my time. Oh, question. Just one question, if I may. Excuse me. But are you from after the first year of the statute until 1999. Yes. Was Arizona acquiescent in this or was there a constant raising of this issue? They did not constantly raise this issue. I believe the first time that they attempted to obtain payment for this type of service was in 1999. I'm sure my opposing counsel can correct me if that's wrong. 1999. Thank you. Thank you, counsel. We'll hear from the appellants. Oh, appellees, rather.  Appellees. Appellees. Appellees. Counsel, you may proceed. Thank you. May it please the Court. Good morning. Good morning. My name is Don Ridings, and I represent the appellees in this matter, the Arizona Healthcare Cost Containment System, which is the state Medicaid agency of Arizona and its director. Today I'd like to cover two main points, time permitting. First, I'd like to explain why we believe the language of the statute, its context, and structure, all support Arizona's interpretation of this statute. And second, I will discuss why the legislative history of this statute, and in particular, the burden-shifting language, which I believe we agree is the principle and key statement of legislative intent in the legislative history, supports the state's interpretation and not the Federal Government's. And in the process, I'll try to respond to some of the points raised in the reply brief and today at oral argument. Now, analysis of the statute begins with its language. And as we've heard in the briefs and again this morning, the Federal appellants do not dispute that the phrase received through, standing alone, certainly in their briefs, they've stated is broad enough to encompass the referred services at issue here, that phrase, standing alone. But from that point of departure, what the Federal Government does is leaps in their brief, and again, I believe at oral argument, to the legislative history. We dispute that analysis of the legislative history, and I'll address that in a moment. But before reaching the legislative history, it is critical to complete the analysis of the language of the statute using the tools of statutory construction that the Supreme Court and this Court have laid down in its decisions, by looking at the language and the structure and the context and the purpose of the statute. Let me begin by explaining why we believe that Arizona's interpretation is faithful to the language of that statute. It's faithful, first and foremost, because the State's interpretation honors the distinction that Congress drew in the Indian Health Act in 1976, between services that are provided in an IHS facility and services that are received through such a facility. Counsel has described the two significant Medicaid changes that Congress made in that statute. They're briefed, and I won't repeat them. And we have to presume that in Congress intended that these two separate statutory provisions meant distinct things. But what services was Congress referring to in these two separate provisions? Well, Congress was not legislating in a vacuum. In 1976, there was an existing Indian health care service delivery system that had been in existence for many, many years. And that system had two distinct but interdependent components. The first component of the IHS system was what was called direct care. Those were services provided by or provided in the IHS facilities themselves. So just to take an example, if a Native American child is playing outside and breaks her arm, is taken to a facility, the arm is set, she's treated and goes home, that was a direct care service provided by the IHS. But IHS facilities could not provide the full range of services that Native Americans needed, which is why the second component of the IHS system was so very critical at that time and still today, and that is the referred service system of the IHS, where IHS would refer Native Americans to contract care providers. So for example, when a patient presents with health chest pains, there's no cardiology facilities there, equipment, the patient could be stabilized, referred then to another hospital where that person could be treated by a non-IHS provider under a contractual arrangement with the facility. And is that the contract that we were discussing in the current situation where there is a negotiation for reduced rates? That was certainly a key component of those contracts. Those contracts are not in the record, and I can't speak to the full scope of them. But certainly my understanding is that a key component was to ensure negotiated rates with those providers, that's correct. And was that analogous to the current contract care service, whatever it is, or where it's an independent provider that's independently billing the patient, or is it more like the independent contractor situation? It is a non-IHS provider that would bill, that would in some cases bill IHS, in some cases would bill other providers. But it was clearly not an IHS provider in the way that IHS facilities were, but certainly as Congress recognized, those referred services providers were the second key component of that IHS healthcare delivery system. They had to be, because the IHS facilities themselves simply were not equipped to provide the full range of services. So the backdrop that Congress was legislating against was this two-component system of direct care and referred services. And I think in assigning meaning to the phrases that Congress used in the statute provided in and received through, it's important that the interpretation account for this system as it existed at the time that Congress was legislating. And that is precisely what Arizona's interpretation does. It is natural to read the phrase provided in, services provided in an IHS facility as referring to the direct care component of IHS services as they existed in 1976 and as they existed today. The same way services received through an IHS facility are naturally read, we believe, to refer to the second component of that IHS healthcare delivery system, which was the referred services program, where folks were referred out to contract care providers. Now, the State's interpretation, I think, accounts for these two distinct phrases in a way that makes sense, is natural, and accords with the system as it existed at the time that Congress was legislating as described in the House report. And the government's interpretation does not. Moving beyond that particular statute, it's also helpful, we believe, to look at the Medicaid statute itself, Title XIX of the Social Security Act, because there Congress has repeatedly defined categories of Medicaid services and what services are eligible for various Medicaid benefits and what are not. And our interpretation is consistent with language that Congress has used in other sections of the Medicaid statute, and we describe some of those in pages 23 to 24 of our brief. And we think that those examples show that Congress knew very well the difference between a service that was provided in a facility or provided by a particular provider and those that were provided through such providers. Roberts. Counsel, Mr. Levy makes a very strong argument, it seems to me, that this would result in a change in approach compared to the last 20 years. What's your response? I think we have a slightly different view of the last 20 years, Your Honor. Let me just leap to that now. I mean, the suggestion, I think, in response to Judge Sand's question, that Arizona has simply sat idly by for some 20 or 25 years doing nothing, and then suddenly a State employee thought they had a great idea to try to get some more Federal Medicaid dollars is simply not correct. The fact is that over the last 20 years, Arizona has consulted with and twice litigated with the agency over the Federal Government's responsibility for services that are provided by Native Americans, by non-IHS providers. Recall that Arizona did not join Medicaid until the 1980s. It was the last State in the country to join Medicaid. And by 1986, litigation had already commenced between Arizona and the agency over the issue of who was responsible for paying for services to indigent Native Americans who received care outside of the IHS system. And in fact, in that very case, the parties were litigating over the meaning of an earlier version of the alternate resource rule that my colleague described, and I'll return to the alternate resource rule in a moment. But that particular case actually went all the way up to this Court. I'll give you the site. It's 857 F2D 1479. I want to hasten to add that this was an unpublished decision of this Court, but I am simply bringing it to your attention as part of the factual record and the public record of the disputes and their origins between the Federal Government and specifically Arizona over who's responsible for non-IHS services. Now, that was in 1987, and around that same time is when this Court also decided the case in McNab that my colleague described, which we believe is a very important decision and I will return to in a moment. In 1989, the agency issued a notice of proposed rulemaking where they proposed to amend or change the language of that alternate resource rule. The reason that they cited for doing that was that they had received adverse decisions from this Court in those two cases that I just described, and they wanted to change or specify how they think the allocation should be between the States and the Federal Government. That rule was adopted in 1990, and I should say it was actually the 1990 final rule where the agency cited the McNab and Arizona decisions as a basis for making that change. That new rule set off a new flurry of consultations and debate and discussion and argument between the agency and Arizona. Much of that is chronicled in the administrative record of this case. Not the — not all of that is in the excerpts of record, but certainly there are a number of letters and correspondence going back and forth in the 90s arguing over the meaning of the 100 percent provision. And then in 1997, the agency issued the memo that you referred to, Your Honor, the 1987 memo discussing referred services. Arizona started filing its claims in 1999 after the agency said that it didn't — it took the position that referred services were not covered under the terms of its memo. So that's a sort of high-level summary of some of the back and forth that's going on, but I think if it demonstrates nothing else, it demonstrates that Arizona has vigorously disagreed with the federal agency's view of its responsibility for Native American health care outside of the IHS system and what the relative responsibilities were. So to conclude with the language of the statute, we believe that both the language and the context of the IHS health care delivery system as it existed at the time, the contrasting language in the statute itself and other provisions of the Medicaid Act all support the State's interpretation of the statutory language that services received through do encompass the referred services, which were a critical component of the health care delivery system in 1976 when Congress was legislating. If I may, I'd like to move with my remaining time and address the legislative history side of the equation, and specifically the burden-shifting language that counsel in this Court have focused on already this morning. We all agree that at a minimum the objective was to avoid shifting a federal responsibility to the State. So the question we agree is, well, what was the federal government's responsibility in 1976 for referred services provided to Native Americans who sought care first from IHS? Now the legislative history, and as this Court has recognized, McNabb speaks expansively about the federal responsibility for Native American health care, not as an exclusive responsibility, and I want to be clear for this panel, that is not our position that the federal government is responsible for all Native American health care. But certainly for Native Americans who have elected to remain on reservations, who have continued to choose the IHS as their provider of health care, the federal responsibility is paramount. Now in this case, the federal government claims that States were paying a portion of this referred services care before 1976. You know, I'm not in a position to say that on behalf of Arizona. Arizona wasn't paying it because Arizona was not in the Medicaid program. But the federal government certainly has not put in any evidence that a single other State paid a single claim for a single service for a single indigent Native American prior to 1976. And we think that if they are going to take the position that as a matter of fact that was occurring, the absence of that evidence should weigh in this Court's consideration. Now, what the federal appellants have relied on in lieu of direct evidence that States were paying a portion of these claims is the alternate resource rule. They say that the alternate resource rule, which is a federal regulation, required States to pay a portion of this prior to 1976 and that Medicaid was secondary. On page 12 of their reply brief, and I want to focus on this, they cite two regulations. They cite 42 CFR 136.61. And then they cite its predecessor regulation, 42 CFR section 36.23. Now, the first of those two cites was not adopted until 1990. I described the rulemaking that the agency went through in response to this Court's decisions to McNabb in Arizona. And we all agree on that. The predecessor regulation, 36.23, did predate the McNabb decisions. And in fact, in its McNabb decision, which we think is quite important in this case, this Court traced the evolution of that alternate resource rule. And I want to call this Court's attention to page 790 of its decision in McNabb. At page 790, this Court stated, quote, The alternate resource rule was promulgated in conformity with the requirements of the Administrative Procedures Act, APA, close quote. It then went on and said, quote, Notice of the proposed rulemaking was published in the Federal Register in 1976. Close quote. It then cited to the point in the Federal Register. It then went on to say that this Court wrote, quote, The final regulation was published in the Federal Register in 1978 and has been included in the Code of Federal Regulations since 1979. Close quote. So as this Court found in McNabb, and as best as we can determine, the specific regulations that were cited in that reply brief were not promulgated until after the Federal Indian Health Care Act was enacted. Now, I want to hasten to add that it is my understanding that prior to 1976, the Federal agency did have an internal policy or a policy position that IHS had the option of assuming residual payer status to Medicaid. And I want to be very clear about that. But to the extent that the I'm not aware of a predecessor regulation to the ones that did not become final until after the Indian Health Care Act was enacted. Now, if one agrees with the formulation at page 16 of the Federal agency's reply brief, that the proper question is whether the IHS paid for referred services for Native Americans with access to Medicaid when the CIA was enacted, I don't think we can agree with that formulation, because as we know, by and large, Native Americans simply did not have access to Medicaid at that time. So for that reason, we believe that this Court can actually completely avoid all of this alternate resource argument altogether on the basis that states could not have been paying for those services. But if this Court agrees that perhaps there was a Native American somewhere who had managed to get enrolled in Medicaid and, in theory, could have received a Medicaid service that would have been billed to a state, and I hasten to add there's no evidence of that, but if this Court accepts that assumption, then we certainly believe that the alternate resource argument is justified. Sotomayor, Native Americans didn't enroll in Medicaid because? Because they did not have access to the Medicaid program, they did not have access to providers, and because the IHS was paying, was taking care of their medical services, either directly or through the referred services program that I described. So, again, we do think that the Court does not have to resolve the alternate resource argument here, because the legislative history is so clear. But if it does... Are you saying that during that period, the federal government through the IHS was paying for all referred services? As far as we can tell. We have, I am, as I sit here today, I am aware of no evidence that Arizona or any other state ever paid for a single share of a single referred service. That wasn't my question. I'm sorry. It was whether the federal government was paying for all of the referred services. The federal government would have paid for all the referred services unless, I mean, perhaps a Native American was a person of means and paid themselves, or maybe had another insurance plan which was primary. So there would have certainly been situations where that would have occurred, I suspect. But it was certainly, it was certainly the federal government that was of paramount, had paramount responsibility for those services. I'm not aware of any state that paid a nickel prior to 76. I see that my time is up. Thank you, counsel. Thank you. Mr. Levy, you have some reserve time. Thank you, Your Honor. What we have here with respect to what was going on prior to 1976 is a lack of direct evidence. My opposing counsel has come up here and said the government presents no evidence that the government was paying. And, of course, he has presented no evidence as to whether the states were or were not paying. We don't have direct evidence. What we do have is we know what the rules were. And there was a very long explanation up here that is essentially incorrect. On our brief on page 25, we cite to 55 Federal Register 4608, which explains the history of the payer last resort rule and traces it all the way back to 1956. So what we know is that from 1956 forward, the Indian Health Service was the payer of last resort. Now, Arizona hypothesizes that the Indian Health Service simply ignored its own rules and paid entirely for referred services even when the state was responsible. I don't think that's a responsible supposition for him or for this Court to make. I think the logical inference is that the Indian Health Service had a payer of last resort rule and that it followed that rule, meaning that it was the payer of last resort and that if a Native American was Medicaid-eligible and covered by Medicaid, his referred services would have to be paid for by Medicaid first and, therefore, not by the Indian Health Service. And what is the consequence? Assume what you just said is true, that one can't – there's no evidence one way or the other. Where does that leave us? Well, where that leaves us is we seem to be in agreement, the parties to this case seem to be in agreement, that Congress's intent with the 100 percent reimbursement rate was to only have that rate apply to services that were at the time being paid for by the Federal Government. If the Indian Health Service was following its own regulations, which we believe is the hypothesis the Court should follow, then the Federal Government was not paying for referred services for Medicaid-covered Native Americans at the time the IKEA was enacted, and it would, therefore, be contrary to congressional intent to apply the 100 percent rate in this circumstance. Thank you, counsel. Your time has expired. Thank you, Your Honor. The case just argued will be submitted for a decision, and we will hear argument next in the United States v. Cassidy, Hardy, Supmet, Kaling, Ortiz. Thank you, Your Honor. Counsel, you may proceed.
judges: O'scannlain, Ikuta, Sand